SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Joseph BREMONT, Jimmy B. Sanchez,
Comcar International, Ltd., Commercial
Capital Resources, Inc., Defendants,

and

Loomis Ltd., Michael Spector and
R.P.S. Financial Group, Inc.,
Relief Defendants.

No. 96 Civ. 8771 (LAK).

United States District Court,
S.D. New York.

Feb. 18, 1997.

Alberto J. Troncoso, Edwin H. Nordlinger, New York City, Andrew J. Geist, Armonk, NY, Eric M. Schmidt, New York City, Anahita N. Kotval, Securities and Exchange Commission, for Plaintiff.

Larry H. Krantz, Anderson & Rottenberg, P.C., New York City, for Defendants Joseph A. Bremont, Comcar International, Ltd., and Commercial Capital Resources, Inc.

Richard M. Asche, Litman, Asche & Gioiella, L.L.P., New York City, for Defendant Jimmy B. Sanchez.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The SEC here claims that the defendants have engaged in a scheme to induce investors to pay defendants fees to obtain orders from major banks to purchase so-called "prime bank instruments" ("PBIs") from the investors. The Commission contends that PBIs do not exist, that the purchase orders are not forthcoming, that defendants are well aware of both facts, and that the defendants' operations simply defraud the investors out of the fees without there being any realistic prospect of the investors realizing on their "in-

vestments." It seeks an order freezing defendants' assets pending trial and requiring them to render a verified accounting of their affairs.[1]

### Facts

Fraud in connection with PBIs, which often are referred to by other names,[2] has become rife in recent years. While the details of these schemes vary, all or most rest on the premise that major international banks buy and sell PBIs—said to be high yield bank instruments—on a secret market that offers large and essentially risk free profits. Brokers or promoters, by one means or another, offer to cut victims in on these profits for a fee. In fact, there is substantial evidence that no such market and no such instruments exist. In any case, banks whose names are used in these schemes often deny any knowledge of the instruments and transactions. *See generally* International Chamber of Commerce, Commercial Crime Bureau, *Prime Bank Instrument Frauds* (1994) (Troncoso Dec.Ex. 2); Board of Governors of the Federal Reserve System, Interagency Advisory, *Warning Concerning "Prime Bank" Notes, Guarantees, and Letters of Credit and Similar Financial Instruments* (Oct. 21, 1993) (*Id.*) The frauds are facilitated by the use of complex structures and technical financial terminology that usually are beyond the ken of potential victims. This case is said to involve such a fraud.

### The Transactions At Issue

The SEC focuses here on four transactions involving defendants Joseph A. Bremont individually and through two companies he controlled, Comcar International. Ltd. and Commercial Capital Resources, Inc. (collectively "Bremont"), and Jimmy B. Sanchez.

Broadly speaking, the SEC contends that Bremont, with the aid of Sanchez, began by persuading investors of the large profits supposedly available from the purchase and sale of PBIs. Bremont then offered, for a fee, to obtain a purchase order for a PBI from a major bank which the investor then would fill by acquiring a PBI elsewhere at a discount and selling it to the buyer thus procured at an enormous profit. In order for the scheme to make apparent sense, the investor had to be persuaded of his or her ability to buy a PBI with which to fill the order supposedly to be obtained by Bremont. The SEC asserts that Bremont knew or recklessly disregarded the facts that (1) no purchase orders could or would be obtained, and (2) even if they could, the PBIs that the investors were to purchase did not exist. The primary beneficiaries of these enterprises, according to the SEC, were Bremont and Sanchez.

### The Pegasus Transaction

On July 26, 1993, Bremont signed a contract with Pegasus Enterprises, Inc. ("Pegasus") in which Bremont promised to provide a purchase order for a PBI in the amount of $8,800,000. (Troncoso Dec.Ex. 38) Pegasus agreed to pay Bremont $150,000, which was to be placed in an escrow account for release to Bremont upon receipt of a PBI purchase order. The evident purpose of the escrow arrangement was to give the investors the false comfort that their funds would not be released until a purchase order was provided.

On August 6, 1993, a purchase order purporting to be from First Federal Bank was received by the escrow agent who, on Bremont's directions, paid $100,000 of the escrow money to Sanchez and most of the rest to Bremont. (Troncoso Dec.Ex. 41) The transaction was a fraud because, as defendants admit, First Federal does not exist and the purchase order was a forgery. (Troncoso Dec. ¶ 5; Bremont Mem. 13; Sanchez Mem. 14)

### The Call Indiana Transactions

On March 29, 1994, Bremont signed a contract through Comcar with a group of investors known as Call Indiana, promising that he would cause a bank to issue a $44 million purchase order for a PBI. (Troncoso Dec. Ex. 42) Call Indiana placed $175,000 in an escrow account, which was released to Bremont upon the escrowee's receipt of a pur-

---

1. The Court previously granted the Commission's request for an asset freeze pending the hearing and determination of this motion.

2. These names include standby letters of credit, prime bank notes, and prime bank guarantees.

chase order from the non-existent First Federal on April 1, 1994. Three additional contracts were signed, with Call Indiana placing $400,000 in the escrow account on each occasion. (*Id.* Ex. 45(A)–(C)) A purchase order from National Westminster Bank was received by the escrow agent on September 1, 1994, resulting in the release of the remaining funds. (*Id.* Exs. 52–53) In total, Call Indiana placed $1,375,000 in the escrow account, almost all of which was transferred directly to Bremont. (Troncoso Dec.Ex. 46) Although the purchase order from National Westminster was apparently genuine when issued "[a] few days later [the bank] became uneasy . . . and . . . duly notified [Bremont] that they were not prepared to be further involved. . . ." (*Id.* Ex. 7) Bremont, however, failed to advise the escrowee or Call Indiana of this fact.

As in the Pegasus transaction, the fraud in the April 1, 1994 transaction resulted from the use of a forged purchase order. The September 1, 1994 purchase order may not have been fraudulent at the time of issuance, although Bremont's failure to notify either the escrow agent or the investors of its subsequent revocation arguably rendered it too fraudulent.

### The Pro Vantage Transaction

A similar pattern was followed in a transaction with Pro Vantage One International ("Pro Vantage."). On February 15, 1995, Bremont signed a contract with Pro Vantage, promising to obtain a purchase order for a $100 million face value PBI. (*Id.* Ex. 30) Pro Vantage paid $350,000 into an escrow account, which was released when a purchase order ostensibly from Turkiye Halk Bankasi was received by the escrowee on March 29, 1995. (*Id.* Ex. 34) Turkiye Halk Bankasi has denied ever issuing the purchase order. (*Id.* Ex. 12)

### The West Point Cadet Transaction

The final transaction involved a group of West Point cadets, who formed an entity called UUPA, and Betty Smith, a housewife with connections to one of the cadets, who served as a liaison between Bremont and the cadets. Chad Bilbrey, a cadet representing the group, and Bremont signed the standard contract on April 14, 1994, in which UUPA would place $250,000 in an escrow account and Bremont would line up a purchase order of $100 million. (Troncoso Dec.Ex. 23) UUPA was promised $5 million in profit. (*Id.*) Although no fraudulent purchase order was delivered, Bremont and Sanchez told Bilbrey that the Bank of Ireland had tried to deliver a purchase order, but UUPA had made a technical error. (*Id.* Ex. 18, at 96; Ex. 27) Accordingly, they insisted that UUPA would have to forfeit its $250,000, although Bremont said he would find another purchaser. Bilbrey released the money on May 7, 1994. (*Id.* Ex. 27) Bremont and Sanchez thereafter repeatedly told Smith that they would iron things out. (*Id.* Ex. 18, at 122–23; 439–440) Nothing happened and Bremont walked away with the $250,000. The Bank of Ireland has provided sworn testimony that it never attempted to deliver a purchase order. (*Id.* Ex. 3)

In this instance, the apparently fraudulent activity of Bremont and Sanchez was their statements to Bilbrey and Smith to induce the release of escrow funds and pacify the victims after the escrow funds were released.

### Discussion

The SEC claims that it has demonstrated a likelihood that both defendants have violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder, triggering this Court's equitable powers to order an asset freeze and verified accounting. Bremont contests the merits and the need for any relief. In the alternative, he argues that he is entitled to an evidentiary hearing on the SEC's factual allegations, a 30 day limitation on the asset freeze, a narrowing of the accounting, and a carve-out of legal expenses from the asset freeze. Sanchez asserts that the court lacks jurisdiction and disputes the merits of the SEC's case against him.

The SEC is entitled to relief if it has established a likelihood that the securities laws have been violated, although the strength of the showing required varies inversely with the severity of the restraint

sought.[3] *SEC v. Unifund SAL,* 910 F.2d 1028, 1036–42 (2d Cir.1990).

> "In order to establish primary liability under § 10(b) and Rule 10b–5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device. Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct.... With respect to § 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security." *Securities and Exchange Commission v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted)

The Court is satisfied that the SEC has made a sufficient showing against both Bremont and Sanchez to justify the relief it seeks here.

*Bremont's Challenge to the Merits*

■ Bremont challenges principally the SEC's assertion that he acted with *scienter.* He claims that (1) any fraud that occurred was perpetrated by other parties and was unknown to him, and (2) there is, or Bremont reasonably could have believed there is, a legitimate market in PBIs.

Assuming for the moment that PBIs exist in exactly the form and volume Bremont claims, the SEC has shown a likelihood that Bremont engaged in fraudulent conduct.[4] It is uncontested that Bremont agreed to procure purchase orders for PBIs for investors from 1993 through 1995, personally netting in excess of $2 million, even though not a single PBI transaction was completed. (Bremont Mem. 2–4) In three separate instances, the

Pegasus, Call Indiana and Pro Vantage transactions, forged purchase orders were faxed to escrow agents, in each instance resulting in the release of escrow funds to Bremont. Bremont offers no explanation for the appearance of these documents. Regarding the UUPA transaction, Smith testified that Bremont specifically told her that the Bank of Ireland would issue a PBI if she and Bilbrey approved the release of escrow money to Bremont. (Troncoso Supp.Dec. ¶ 6) The Bank of Ireland denies ever participating in or representing that it would participate in a PBI transaction. (Troncoso Dec.Ex. 3)

■ Even if the Court were to credit Bremont's protestations of ignorance as to the origin of these fraudulent purchase orders, it would determine that Bremont acted with *scienter.* "[R]epresentations and opinions ... given without basis and in reckless disregard of their truth or falsity" establish scienter under Rule 10b–5. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 48 (2d Cir. 1978); *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). Bremont accepted large fees for brokering transactions in securities which, if they exist at all, seem to be the financial world's equivalent of the rarest of endangered species. He admits that he failed to make the slightest attempt to verify the purchase orders which he admits were fraudulent. (Troncoso Dec.Ex. 21, at 196–97) Considering the sums involved and the risks to his clients, the SEC is likely to establish that such behavior comfortably qualifies as reckless.

Regarding Bremont's second point, the SEC has presented cogent authority as to the fraudulent nature of PBIs. Judge Posner recently commented that "Prime Bank Instruments do not exist." *SEC v. Lauer,* 52

---

**3.** The SEC need not establish likelihood of future violations unless it is seeking mandatory relief. *Unifund,* 910 F.2d at 1041. The Court notes, however, that the SEC would have satisfied this additional burden. "[T]he commission of past illegal conduct is highly suggestive of the likelihood of future violations." *Id.* This second element is met if defendants have made "efforts to move assets offshore." *SEC v. Vaskevitch,* 657 F.Supp. 312, 314 (S.D.N.Y.1987). Bremont transferred proceeds from the West Point and Call Indiana transactions to foreign bank accounts. (Troncoso Dec.Exs. 28, 50) Sanchez appears to be staying out of the United States, holds a Liberian passport (Troncoso Dec.Ex. 41), and has had proceeds from his illegal activity transferred to a foreign bank account.

**4.** The existence of PBIs is immaterial to this Court's jurisdiction under the securities laws, as explained *infra.*

F.3d 667, 670 (7th Cir.1995). As early as 1993, federal agencies warned of "schemes involving 'prime' bank financial instruments." (Troncoso Dec.Ex. 1) The SEC has gathered statements from major banks denying that they ever engaged in PBI transactions. And the press has provided substantial coverage of the fraudulent nature of PBIs. (Troncoso Dec.Ex. 2)

Bremont disputes all of this. He turns to several pieces of "evidence." The first is a declaration from Standard Bank of London Limited ("SBLL"). The document, however, is equivocal, stating that SBLL trades in discounted bank securities and considered entering into a deal with the fictitious First Federal. (Troncoso Dec.Ex. 10) The statement does not mention PBI or any of its common synonyms. A second bank declaration, that of Bank Bumipatra Malaysia Berhad, offers no evidence of the existence of PBIs.[5] (Troncoso Dec.Ex. 5) Bremont looks also to various testimonial excerpts from victims of his schemes. Sam Jackson, the president of Call Indiana, claims that he deals in transactions involving instruments similar to PBIs, although his testimony is far from lucid. (Krantz Dec.Ex. 1) Smith, who is a housewife with no documented expertise in financial instruments, states that she believes PBIs exist. (Troncoso Dec.Ex. 18) Thomas Kiser, who represented the investors in the Pro Vantage transaction, stated that he has a friend in Thailand who had indicated that he might be able to provide Kiser with a PBI. (Krantz Dec. Ex. 4)

Bremont's evidence is of little force. Given the strength of the SEC's showing, it is insufficient to undermine the conclusion that the SEC has met its burden here.

*Bremont's Request for a Hearing*

■ Bremont argues also that he is entitled to a hearing. The Court disagrees. While hearings may be very important on some applications for interlocutory relief, they are not essential on all. As Judge Friendly wrote in *SEC v. Frank,* 388 F.2d 486 (2d Cir.1968):

> "In many instances there is no serious dispute about the facts' the issues, perhaps very troublesome ones, concern the meaning and applicability of a statute or common law rule [sic]. The taking of evidence would serve little purpose in such cases; argument is what the judge requires. In another group [of cases] there is little dispute as to the raw facts but much as to the inferences to be drawn from them [and a hearing should be held whenever practicable].... At the other end of the spectrum are cases where everything turns on what happened and that is in sharp dispute; in such instances [a hearing is desirable]."

*Id.* at 490–91. *See Dopp v. Franklin National Bank,* 461 F.2d 873, 879 (2d Cir. 1972); *SEC v. Musella,* 578 F.Supp. 425, 427–28 (S.D.N.Y.1984).

This case is closest to the "no serious dispute" end of the spectrum. It is conceded here that the Pegasus and April 1, 1994 Call Indiana transactions both involved the presentation to the escrowee of a forged purchase order resulting in Bremont's immediate receipt of investor funds. Bremont offers no remotely credible explanation for the miraculous appearance of these forged PBI purchase orders. Furthermore, he offers no explanation for his false representations to Smith regarding the Bank of Ireland in the UUPA transaction. It is difficult to imagine what purpose would be served by a hearing with respect to these actions; even if there are factual disputes as to other matters, the SEC still would be entitled to relief.

Bremont's second argument—that PBIs exist—also fails to merit a hearing. The Court has received published reports dating from 1993 from both the SEC and the ICC (Troncoso Dec.Exs. 1, 2), widespread press reports documenting PBI frauds (*id.*), and numerous declarations from leading banks that they do not participate in such transactions (*id.* Exs. 3–16). At best, Bremont's counter-evidence if credited, would prove

---

5. The bank's admission that it *issues* standby letters of credit and other guarantees to customers, legitimate bank activities, has no relevance to the present case. It is the purported resale of standby letters of credit which renders them PBIs, an activity which the bank "has never arranged, [been] a party to, requested or agreed to be a part of any transaction involving." (Troncoso Dec.Ex. 5)

that the odd minor foreign bank on occasion may have issued or considered issuing a PBI purchase order. In no way would it establish that any material number of leading banks issue PBIs or that there is an active market in them. Accordingly, the Court declines to hold a hearing.

*Sanchez's Challenge to the Merits*

■ Sanchez's first contention, that the Court lacks subject matter jurisdiction over the case, is easily dismissed. The SEC asserts, and Sanchez wisely does not dispute, that PBIs, if they existed, would be securities. (SEC Mem. 17–21; Sanchez Mem. 8–9) "The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions." *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984). Making substantial misrepresentations as to the value of a worthless but technically extant security is a paradigmatic form of securities fraud. Extending the protection of the securities laws to the victims of schemes so fraudulent that the underlying paper does not exist logically follows, as fraudsters would have a perverse incentive to magnify their deceptive conduct. Other courts have reached the same conclusion. *See Lauer*, 52 F.3d at 670 ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws."); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 553 n. 10 (S.D.N.Y. 1990) (fact that securities do not exist "does not remove [an] action from the operation of the federal securities laws.").

■ Sanchez contends that even if the securities laws reach fictitious securities, the Court lacks jurisdiction over the conduct at issue. Rule 10b–5 prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." It is the "in connection with" language upon which Sanchez focuses.

The Supreme Court stated in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), that "§ 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities ..." *Id.* at 10 n. 7, 92 S.Ct. at 168 n. 7 (1971) (*quoting A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir.1967)); *see Perez–Rubio v. Wyckoff*, 718 F.Supp. 217, 236 (S.D.N.Y. 1989). The Court "construed the phrase 'in connection with' flexibly to include deceptive practices 'touching' the sale of securities, a relationship which has been described as 'very tenuous indeed.'" *United States v. Newman*, 664 F.2d 12, 18 (2d Cir.1981) (citations omitted); *see also Chemical Bank*, 726 F.2d at 943 (expressing discomfort with breadth of *Bankers Life* standard). The SEC has demonstrated the likelihood that defendants took large fees, essentially brokerage commissions, for setting up deals for non-existent securities. Such behavior clearly satisfies Rule 10b–5's "in connection with" language.

■ Sanchez next argues that the SEC has failed to establish a likelihood that he acted with *scienter*.[6] Even discounting Bremont's testimony against Sanchez due to Bremont's obvious incentive to exaggerate Sanchez's role, and recognizing that the SEC's evidence against Sanchez is far less copious than it is against Bremont, the SEC nonetheless has met its burden, which is modest given the limited nature of the relief it seeks.

Smith's testimony establishes that Sanchez, who describes himself as Bremont's lawyer (Sanchez Mem. 2), communicated with Smith, telling her that he was negotiating with several banks and would get a purchase order issued to close the UUPA transaction. (Troncoso Dec.Ex. 18 at 122–23, 414, 440) Such representations appear to have been false. Equally damning, in the Pegasus transaction Sanchez received $100,000 of the $150,000 that was fraudulently released from an escrow account after a purchase order from the non-existent First Federal was faxed to the escrow agent. (Troncoso Dec. Ex. 41)

■ When given the opportunity to refute this evidence, Sanchez invoked the Fifth Amendment, refused to testify before the SEC (Troncoso Dec.Ex. 17), and chose not to

---

**6.** Like Bremont, Sanchez does not challenge the other elements of the SEC's case.

submit an affidavit to the Court. Generally speaking, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence against them . . ." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *see United States v. One Parcel of Property Located at 15 Black Ledge Drive,* 897 F.2d 97, 103 (2d Cir.1990). The Court is entitled to and does draw an adverse inference from Sanchez's silence. Accordingly, the Court finds that the SEC has met its burden as to Sanchez.

Because the SEC has made the requisite showing as to both defendants, the Court will extend the asset freeze. However, the Commission is not entitled to freeze assets unrelated to its investigation. Accordingly, the SEC is ordered to file with the Court within 60 days an estimate of defendants' maximum liability, including all penalties and interest, whereupon the Court will entertain an application to modify the amount frozen.[7]

*Verified Accounting and Carve Out For Legal Fees*

█ Defendants contest also both the need for and scope of the SEC's request for a verified accounting. Because defendants are in possession of over $2 million that, more than likely, they have attained improperly from investors, an accounting is appropriate. *See SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1105 (2d Cir.1972). Such relief is minimally intrusive.

█ Defendants request also that the Court allow them access to their frozen resources for the purpose of paying legal bills. "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *SEC v. Quinn,* 997 F.2d 287, 289 (7th Cir.1993) (citations omitted). Until such time as the Court can determine whether the frozen assets exceed the SEC's request for damages, defen-

dants will not be permitted to use any of the frozen assets.

*Conclusion*

The SEC's request for an asset freeze is granted. Each defendant will provide the SEC with a verified accounting of his assets within 30 days. The SEC, within 60 days, will provide the Court with a statement setting forth the maximum sum it will request, including all penalties and interest, and, as soon as is practicable, an estimate of the total value of defendants' frozen assets.

SO ORDERED.

---

**7.** Defendants' unconvincingly cite *Unifund* for the proposition that all assets should be freed in 30 days. *Unifund* limited the duration of an asset freeze because the SEC had failed to make a *prima facie* showing against the defendant, 910 F.2d at 1042, and is thus inapropos to the situation at bar.