**Nancy HARGRAVE, on behalf of herself and all others similarly situated, Plaintiff–Appellee,**

**Vermont Protection and Advocacy, Inc., Plaintiff–Intervenor–Appellee,**

v.

**State of VERMONT, Vermont Department of Developmental and Mental Health Services, and Susan C. Besio, in her capacity as Commissioner of the Vermont Department of Developmental and Mental Health Services, Defendants–Appellants.**

**Docket No. 02–7160.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 24, 2002.

Decided: Aug. 1, 2003.

Bridget C. Asay, Assistant Attorney General, State of Vermont Office of the Attorney General, Montpelier, VT, for Defendants–Appellants.

Paul M. Smith (Leondra R. Kruger, of counsel), Jenner & Block LLC, Washington, D.C., for Plaintiff–Appellee and Plaintiff–Intervenor–Appellee.

John Townsend Rich (Richard L. Matheny, III, of counsel), Shea & Gardner, Washington, D.C., for Amici Curiae 18 Former State Mental Health Commissioners, the National Mental Health Association, the Vermont Association for Mental Health, the International Association of Psychosocial Rehabilitation Services, the New York. Association of Psychiatric Rehabilitation Services, the American Network of Community Options and Resources, HalfthePlanet Foundation, the American Association of People with Disabilities, the Polio Society, and the National Health Law Program.

Susan Stefan (Robert D. Fleischner, of counsel), Center for Public Representation, Northampton, MA, for Amici Curiae National Association of Protection and Advocacy Systems, the Judge David Bazelon Center for Mental Health Law, and National Association of Rights Protection and Advocacy.

Before: VAN GRAAFEILAND, JACOBS, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

We consider here an appeal from a February 7, 2002 judgment of the United States District Court for the District of Vermont (Jerome J. Niedermeier, *Magistrate Judge* ) granting plaintiffs' motion for partial summary judgment and permanently enjoining the implementation and enforcement of several sections of Vermont's "Act 114," Vt. Stat. Ann. tit. 18, § 7624 *et seq.*, which the District Court held facially discriminated against mentally disabled individuals in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The principal questions presented by this appeal are (i) whether plaintiffs have alleged a sufficient injury-in-fact to support standing to challenge Act 114; (ii) whether this suit is ripe for adjudication; (iii) whether Act 114 violates the ADA by distinguishing between "qualified individuals" on the basis of mental illness; and (iv) if so, whether the District Court's injunction prohibiting enforcement of certain provisions of Act 114 effects a fundamental alteration to the discriminatory "service, program, or activity." We hold that the suit is ripe for adjudication, that plaintiffs have standing, and that Act 114 does facially discriminate against mentally disabled individuals in violation of the ADA and the Rehabilitation Act. We also hold that defendants have failed to submit evi-

dence sufficient to demonstrate that the injunction fundamentally alters the discriminatory State program. Accordingly, we affirm the judgment of the District Court.

## BACKGROUND

### I. Act 114

Under Vermont law, an adult may execute a durable power of attorney for health care ("DPOA"), which allows him to guide health care providers in the event of his incapacity by appointing a guardian and, if desired, by articulating preferences for or limitations on treatment. Vt. Stat. Ann. tit. 14, § 3451 *et seq.* Until 1998, Vermont statutes provided two principal mechanisms for overriding DPOAs: First, individuals could revoke their own previously executed DPOAs,[1] *id.* § 3457(a). Second, a third party could petition the probate court to suspend an individual's DPOA in conjunction with that court's appointment of a guardian for the individual, *id.* § 3463(a).

In 1998, the Vermont Legislature passed "Act 114," Vt. Stat. Ann. tit. 18, § 7624 *et seq.*, the subject of this challenge, which established a third procedure for overriding the DPOAs of certain patients who are committed or imprisoned. Under Act 114, health care professionals may petition in family court for authority to medicate involuntarily individuals who have been civilly committed or prisoners who have been judged mentally ill. *Id.* § 7624(a)(1)-(3). When the proposed involuntary medication would contravene a patient's validly executed DPOA, Act 114 requires the court to suspend judgment until the patient has been treated (or not treated) in

accordance with his DPOA for a period of 45 days. *Id.* § 7626(c). If the court concludes that, after 45 days, the patient "has not experienced a significant clinical improvement in his or her mental state, and remains incompetent," the court may proceed to determine whether he should be involuntarily medicated according to the factors otherwise relevant under Act 114, with no further regard for his DPOA, *id.* § 7626(c)(2).

In passing Act 114, the Vermont Legislature expressly intended to supersede the previously existing procedures for involuntarily medicating individuals civilly committed for the treatment of mental illness, which were established by a 1985 consent decree in *J.L. v. Miller*, No. S–418–84–WnC (Vt.Super.Ct. Washington County May 20, 1985). Vt. Stat. Ann. tit. 18, § 7629(d) ("This act will render the J.L. v. Miller consent judgment no longer applicable."). *J.L. v. Miller* provided that, before a health care professional may medicate a committed patient involuntarily, the Vermont Human Service Board must conduct an adjudicatory hearing at which a hearing officer must first find the patient incompetent, then "ascertain and effectuate the decision the patient would have made if competent." *J.L. v. Miller*, No. S–418–84–WnC, at 7–8. The *J.L. v. Miller* consent decree did not specifically provide for circumstances in which patients had DPOAs, but it is not disputed that a validly executed DPOA constitutes relevant and substantial evidence of the decision an incompetent patient would make if competent.

Following the enactment of Act 114, Vermont attempted to apply the procedures set forth in Act 114 to patients who had DPOAs, instead of those established

---

1. This could take place by a party's explicit revocation, Vt. Stat. Ann. tit. 14, § 3457(a)(1), by his valid execution of a subsequent DPOA, *id.* § 3457(a)(2), or by his divorce from his appointed agent, *id.* § 3457(a)(3).

by *J.L. v. Miller*, but the family court dismissed petitions filed under Act 114 for involuntary medication on the ground that the *J.L. v. Miller* consent decree would govern until vacated or modified. *See J.L. v. Miller*, 817 A.2d 1, 5 (Vt.2002).

Vermont subsequently petitioned for relief from the consent decree. The petition was denied by a state trial court in 1999, *J.L. v. Miller*, No. S418–84–WnC (Vt.Super. Ct. Washington County Dec. 30, 1999), whereupon Vermont officials ceased to seek involuntary medication under Act 114 pending an appeal to the Vermont Supreme Court. On October 18, 2002, the Vermont Supreme Court ruled in the State's favor, reversing the trial court and granting the State relief from judgment with respect to the consent decree. *J.L.*, 817 A.2d at 6. The Vermont Supreme Court specifically noted that, "[u]ntil ..., in a proper case, one or more provisions of Act 114 are successfully challenged as unconstitutional or otherwise invalid, Act 114 takes precedence over the J.L. Consent Decree." *Id.* Here we consider just such a challenge, brought in the District Court.

## II. Factual and Procedural History

Plaintiff Nancy Hargrave is a resident of Vermont who suffers from paranoid schizophrenia, for which she has been hospitalized multiple times since 1995 in the Vermont State Hospital. While hospitalized in 1997, she was twice the subject of proceedings for involuntary medication; the earlier proceeding yielded a finding that Hargrave was competent to refuse medication, but the later one resulted in a finding that she was incompetent to do so. Upon the second finding, she was administered psychiatric medication over her objection in a non-emergency situation.

On April 14, 1999, Hargrave executed a DPOA designating a guardian in the case of incapacity and refusing the administration of "any and all anti-psychotic, neuroleptic, psychotropic or psychoactive medications," and electroconvulsive therapy.[2] Hargrave then initiated this suit on April 27, 1999, raising claims pursuant to 42 U.S.C. § 1983 against the State of Vermont, the Vermont Department of Developmental and Mental Health Services, and Susan C. Besio, in her capacity as Commissioner of that Department (collectively, "defendants"). She claimed that the provisions of Vermont's Act 114 that permit the abrogation of DPOAs executed by patients who have been committed violate Title II of the ADA and Section 504 of the Rehabilitation Act,[3] and she sought to enjoin enforcement of the relevant provisions.

On June 7, 1999, defendants moved to dismiss Hargrave's claims for lack of subject matter jurisdiction because she had not alleged an "injury-in-fact" sufficient to support standing. The District Court denied their motion on January 11, 2000. *See Hargrave v. State of Vermont*, No. 2:99–CV–128 (D.Vt. Jan. 11, 2000). In the same order, the District Court granted a

---

2. Hargrave was not hospitalized on April 14, 1999, and nothing in the record suggests that she did not meet Vermont's statutory requirements for valid execution of a DPOA. *See* Vt. Stat. Ann. tit. 14, § 3456 (requiring that two witnesses "affirm that the principal appeared to be of sound mind and free from duress at the time the [DPOA] was signed and that the principal affirmed that he or she was aware of the nature of the documents and signed it freely and voluntarily").

3. Hargrave later amended her complaint to incorporate challenges to Act 114 under the Equal Protection and Due Process Clauses of the United States Constitution. *Hargrave v. State of Vermont*, No. 2:99–CV–128, at 9–10 (D.Vt. Feb. 4, 2000). Having granted summary judgment under the ADA, however, the District Court did not reach these claims. *Hargrave v. State of Vermont*, No. 2:99–CV–128, at 30–31 (D.Vt. Feb. 6, 2001).

motion to intervene filed by Vermont Protection and Advocacy, Inc., a non-profit corporation authorized by state and federal law to pursue legal remedies on behalf of the mentally ill. *Id.* On July 5, 2000, upon Hargrave's motion, the District Court certified as a plaintiff class all "individuals within the state of Vermont who have been or in the future will be diagnosed as having a mental illness and who either have or will execute a durable power of attorney for health care or have been or in the future will be deterred from executing such an advance directive for health care as a result of Act 114." *Hargrave v. State of Vermont,* No. 2:99–CV–128, at 8–9 (D.Vt. July 5, 2000).[4]

On cross-motions for summary judgment, the District Court granted partial summary judgment to the plaintiffs, holding that "Act 114 facially discriminates against the mentally disabled in violation of Title II of the ADA and Section 504 of the Rehabilitation Act." *Hargrave v. State of Vermont,* No. 2:99–CV–128, at 30 (D.Vt. Oct. 11, 2001). On October 25, 2001, defendants moved for alteration or amendment of the judgment pursuant to Federal Rule of Civil Procedure 59(e),[5] and on December 21, 2001, the District Court issued a further Opinion and Order specifying that portions of Act 114 facially discriminated against the mentally disabled "to the extent to which the provisions allow their lawfully executed DPOAs to be abrogated in non-emergency situations when they have been determined to be ... incompetent to make their own health care decisions." *Hargrave v. State of Vermont,* No.

2:99–CV–128, at 2 (D.Vt. Dec. 21, 2001). Final judgment was entered on February 7, 2002, and defendants timely appealed.

## DISCUSSION

We review District Court determinations on motions to dismiss and motions for summary judgment *de novo.* See, e.g., *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003).

### I. Standing

#### A. Injury–in–Fact

■ Defendants appeal the District Court's denial of their motion to dismiss plaintiffs' claims for lack of standing. In particular, they allege that Hargrave and the rest of the plaintiff class have not suffered an injury-in-fact. The Supreme Court has defined an injury-in-fact as "an invasion of a legally protected interest [that] is (a) concrete and particularized, ... and (b) *actual and imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added).

■ It is undisputed that, at the time of filing, Hargrave had a history of commitment and involuntary medication, and that she had executed a DPOA refusing certain forms of psychiatric treatment. Defendants nevertheless argue that the threat of Act 114's enforcement was not sufficiently "imminent" to constitute an injury-in-fact for the purposes of standing. Specifically, defendants argue that, in light of the Ver-

---

4. We note that defendants have renewed their objection to class certification on appeal. However, we conclude that they have failed to demonstrate that the District Court erred in certifying the plaintiff class, particularly because they do not contest that the District Court properly applied the requirements of Fed.R.Civ.P. 23. *See* Defs.' Br. at 71–72.

5. Federal Rule of Civil Procedure 59 provides, in relevant part: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." Fed. R.Civ.P. 59(e).

mont trial court's refusal to enforce Act 114, "neither Hargrave nor anyone else has suffered an injury-in-fact under Act 114." [6] Defs.' Br. at 66–67.

■■■ At the time Hargrave filed her complaint the State's lawsuit challenging the *J.L. v. Miller* consent decree was already pending. Accordingly, Hargrave had reason to believe that Vermont would soon be permitted to enforce the Act. This belief was clearly reasonable in light of the fact that, after Hargrave filed the instant action, the Vermont Supreme Court ruled in favor of Vermont's enforcement of Act 114 in *J.L. v. Miller*, 817 A.2d 1 (Vt.2002).[7] We cannot hold, in such circumstances, that the threat of Act 114's enforcement was too "conjectural or hypothetical," *see Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, to constitute an injury-in-fact when Hargrave originally filed her complaint.

### B. Ripeness

■■■ Whatever questions regarding this suit's ripeness existed at the time of briefing due to the non-enforcement of Act 114 have been mooted by the Vermont Supreme Court's decision of October 18, 2002, in *J.L. v. Miller*, 817 A.2d 1 (Vt. 2002), which held that the Act supersedes the 1985 consent decree. *See Blanchette*

**6.** Defendants bring to our attention proceedings in Vermont probate court since this class action was initiated that establish that Hargrave has revoked her DPOA. Because Hargrave presently has no DPOA that could be abrogated by Act 114, she appears to have lost *individual* standing since she initiated this suit. However, this change in Hargrave's circumstances does not affect the validity of class certification or raise any question as to the existence of a valid controversy with respect to the unnamed class members. *See Sosna v. Iowa*, 419 U.S. 393, 398–403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (holding that "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the representative]"); *see also Franks v. Bowman*

*v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("[S]ince ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern."); *American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 n. 4 (2d Cir.1989) ("[I]t is irrelevant whether the case was ripe for review when the complaint was filed."). We therefore proceed to the substance of defendants' claims under the ADA.

### II. Applicability of the ADA and Rehabilitation Act

■■■ Title II of the Americans with Disabilities Act provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove a violation of Title II, a party must therefore establish: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity;

*Transp. Co.*, 424 U.S. 747, 752–57, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982). We therefore decline to require plaintiffs' counsel to name a new class representative, despite their expressed readiness to do so. *See* Letter from Paul M. Smith, dated Oct. 16, 2002, at 4.

**7.** This ruling is not directly dispositive, however, because standing determinations must be made on the basis of what was known at the time a suit was initially filed. *See Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir.1994) (citing *Lujan*, 504 U.S. at 569, 112 S.Ct. 2130 n. 4).

and (3) that such exclusion or discrimination was due to his disability. *Id.* These requirements apply with equal force to plaintiffs' Rehabilitation Act claims. *See Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir.1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.") (citing *Lincoln Cercpac v. Health & Hosps. Corp.,* 147 F.3d 165, 167 (2d Cir.1998)).

### A. Does Act 114 Exclude "Qualified Individual[s]" from a "Service, Program, or Activity" Under the ADA?

■ A "qualified individual" under the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices ... meets the essential eligibility requirements for ... participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Defendants "do[ ] not dispute that a person with a mental illness may be qualified to prepare and rely upon a DPOA." Defs.' Br. at 25. Nor do they contest that Hargrave in particular was qualified to execute her DPOA. Rather, they urge us to find that Hargrave and the rest of the plaintiff class fall into an exception to the ADA for otherwise qualified individuals who pose a "significant risk to the health or safety of others." Defs.' Br. at 26.

At least in the context of employment, the ADA permits "qualification standards" for employees to take into account whether an employee or potential employee poses "a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b); *see also School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (holding that whether a teacher infected with tuberculosis was "otherwise qualified" to teach depended in part on the extent to which she posed a risk of harm to third parties).

Vermont's civil commitment statutes require a judicial finding that a person "poses a danger of harm to himself or others," or that he is substantially likely to pose such a danger if treatment is discontinued, before he can be civilly committed.[8] *See* Vt. Stat. Ann. tit. 18, §§ 7101(16),(17), 7617. Defendants argue that, because Act 114 only authorizes state courts to override the DPOAs of individuals who are subject to standing orders of civil commitment, every patient subject to Act 114 poses a "direct threat" of harm to others and, therefore, falls outside the protections of the ADA. In sum, defendants invite us to hold that a Vermont court's determination of dangerousness at the time of civil commitment is sufficient to exclude an otherwise "qualified individual" from the protections of the ADA under the "direct threat" exception for the entire length of her commitment.

■ In the employment context, it is the defendant's burden to establish that a plaintiff poses a "direct threat" of harm to others, *see Lovejoy–Wilson* 263 F.3d at 220 (citing legislative history of the ADA, H.R.Rep. No. 101–485, pt. 3, at 46 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 469), and that determination requires " 'an *individualized* assessment of the [employee's] *present* ability ... based on medical or other *objective* evidence," ' *id.* (quoting *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 569, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999))(emphasis added; alteration in orig-

---

**8.** Prisoners in Vermont's correctional facilities also must be judged mentally ill and dangerous before they become subject to Act 114.

*See* Vt. Stat. Ann. tit. 18, §§ 7627(a), 7624(a)(3), 7101(17).

inal). To determine whether an individual poses a "direct threat," we consider: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." *Id.*

It is unclear whether the "direct threat" defense applies outside of the employment context. Even if it does, however, we agree with the District Court that defendants have not met their burden of demonstrating that each and every patient subject to Act 114 necessarily poses "a direct threat to the health and safety of others" sufficient to exclude them from the protection of the ADA. First, the State court's legal determination of dangerousness can be based on a finding that the individual merely poses a danger of harm to "himself," Vt. Stat. Ann. tit. 18, § 7101(17), whereas the "direct threat" defense requires the person to pose a risk of harm to *others.* Further, the State does not make an individualized and objective determination of the danger posed by a particular patient *at the time it abrogates* her DPOA. Between the time a patient's commitment order is entered and the time her DPOA may be abrogated under Act 114 (at least 45 days later), many factors may affect the level of danger the patient poses, including, most notably, the fact of commitment itself. As the District Court noted, defendants have offered no evidence that a period of commitment would not significantly mitigate—if not eliminate—the "threat" posed by some or most patients. *See Hargrave v. State of Vermont,* No. 2:99–CV–128, at 20 (D.Vt. Oct. 11, 2001). Defendants have therefore failed to demonstrate that every person subject to Act 114's DPOA-abrogation procedures poses a "direct threat" of harm to others sufficient to exclude her from the protections of the ADA.

We therefore conclude that Act 114 excludes from the State's DPOA program "qualified individuals" who meet the essential eligibility requirements for maintaining DPOAs.

**B. Does Act 114 Discriminate on the Basis of Disability?**

 For purposes of the ADA, the term "disability" includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h) (2001); *see also E.E.O.C. v. J.B. Hunt Transport, Inc.,* 321 F.3d 69, 74 (2d Cir.2003). Act 114 may be applied *only* to the mentally ill. *See* Vt. Stat. Ann. tit. 18, § 7624(a)(1)-(3) (identifying three categories of individuals subject to Act 114, each of which relies on a finding that an individual is "a person who is suffering from mental illness" under Vt. Stat. Ann. tit. 18, § 7101(17) (defining a "person in need of treatment")). Nevertheless, defendants argue that the Act does not discriminate on the basis of mental illness because it does not affect *all* the mentally ill within the State of Vermont, but rather, only "the small class of people who are mentally ill, dangerous, committed to State custody, and incompetent to make treatment decisions." Defs.' Br. at 32. However, it is immaterial to the discrimination analysis that Act 114 applies only to a subset of the mentally ill rather than to every mentally ill individual in Vermont. *See, e.g., Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 598, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (finding discrimination on the basis of mental illness where only institutionalized mentally ill patients were affected); *cf. Messier v. Southbury Training Sch.,* No. 3:94–CV–1706(EBB), 1999 WL 20910, at *10 (D.Conn. Jan. 5, 1999) (listing cases in which courts have held that the ADA and Section 504 prohibit discrimination based on the severity of disability). A program may discriminate

on the basis of mental illness if it treats a mentally ill individual in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances.

Defendants also argue that Act 114 does not discriminate on the basis of disability for the purposes of the ADA because the DPOA of every Vermont citizen who becomes incapacitated is equally subject to Vermont's two statutory abrogation procedures—in probate court in conjunction with appointment of a guardian (for all incompetent individuals), and in family court by the terms of Act 114 (for committed, mentally ill individuals). Defendants are correct that every citizen of Vermont who executes a DPOA is, *at that time,* potentially subject to each of the two statutory DPOA-abrogation procedures should he become incapacitated. However, Act 114 does not operate at the time individuals execute DPOAs; rather, Act 114 becomes operative, and distinguishes between individuals on the basis of mental illness, at the moment patients are judicially determined to be incompetent to make treatment decisions. Of all patients incompetent to refuse treatment for any reason, only those who have been determined by State courts to be mentally ill in a manner justifying commitment are subject to Act 114 override of their DPOAs. Put another way, Act 114 establishes a procedure whereby *only mentally ill patients* who have been found to be incompetent may have their treatment preferences as expressed in their DPOAs overridden in family court; equally incompetent patients who are physically ill or injured enjoy the security of knowing that their DPOAs may only be abrogated in probate court after appointment of a guardian to protect their interests.

Finally, defendants argue that it is the fact of civil commitment, rather than mental illness, that distinguishes those subject to Act 114 from those who are not. However, not all who are subject to civil commitment in Vermont are subject to Act 114—only those who are civilly committed as a result of mental illness. *See* Vt. Stat. Ann. tit. 18, § 7624(a)(1)-(3) (subjecting to Act 114 only those patients who have been civilly committed due to mental illness or found mentally ill while incarcerated); *see also id.* § 1058 (authorizing civil commitment of persons with untreated tuberculosis); *id.* § 8402 (authorizing civil commitment of "drug addicts"). Accordingly, Act 114 discriminates on the basis of mental illness.[9]

### C. Does Enjoining Enforcement of Act 114 Effect a "Fundamental Alteration" of a "Service, Program, or Activity" of the State of Vermont?

■ Defendants argue that, even if Act 114 discriminates against the mentally ill, we should reverse the District Court's judgment because the injunction "would fundamentally alter programs of civil commitment in Vermont." Defs.' Br. at 50. The regulation on which defendants rely, 28 C.F.R. § 35.130(b)(7), provides:

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

---

9. In so holding, we do not suggest that Act 114 would necessarily accord with the ADA if it pertained to all the civilly committed, rather than only those committed individuals who have been found mentally ill.

The defendants fail to identify clearly and consistently the "program, service, or activity" that they believe would be fundamentally altered by upholding the District Court's injunction. They interchangeably characterize the relevant program as " 'the State's program of involuntarily treating committed patients,' " Defs.' Br. at 42 (quoting Dr. Francke's affidavit); "the State's program of medical treatment for committed patients," *id.* at 43; "the State's program of civil commitment," *id.* at 40, 45 (characterizing the State's argument before the District Court); "the actual statutory program enacted by the legislature (and under review by the court in this case)," *id.* (presumably referring either to the enjoined provisions of Act 114 or to Act 114 in its entirety); and "the State's program under Act 114," *id.* at 46.

However, the specific language of section 35.130(b)(7) makes clear that the "service, program, or activity" at issue is neither Vermont's entire civil commitment program nor the specific procedures set forth in Act 114, but rather, Vermont's program of permitting its citizens to execute DPOAs.

Section 35.130(b)(7) requires state entities to make "reasonable modifications in policies [or] practices" in order to avoid discrimination unless the modifications would constitute a fundamental alteration to the relevant "service, program, or activity." 28 C.F.R. § 35.130(b)(7). This language mirrors that of 42 U.S.C. § 12131(2), which defines a "qualified individual with a disability" as "an individual who, with or without *reasonable modifications to rules, policies, or practices* . . .

meets the essential eligibility requirements for . . . participation in *programs or activities* provided by a public entity." 42 U.S.C. § 12131(2) (emphasis added). We have previously made clear that 28 C.F.R. § 35.130(b)(7) was intended to implement 42 U.S.C. § 12131(2). *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98, 109 (2d Cir.2001) (interpreting section 35.130(b)(7) to mean "that a state [must] make reasonable modifications in its programs, services or activities . . . for 'qualified individual[s] with a disability,' . . . 42 U.S.C. § 12131(2), unless the state can establish that the modification would work a fundamental alteration in the nature of the program, service, or activity" (internal citations omitted)).

The District Court held, and it is undisputed on appeal, that the relevant "service, program, or activity" in this case for the purposes of the ADA is "the statutorily created opportunity to execute a DPOA for health care and the right *to have it recognized and followed.*" *See Hargrave v. State of Vermont,* No. 2:99–CV–128, at 23 (D.Vt. Oct. 11, 2001) (emphasis in original). Accordingly, Vermont's DPOA program is also the relevant "program[ ] or activity" for purposes of section 35.130(b)(7).

Defendants have failed even to assert clearly, much less show, that the injunction issued by the District Court would fundamentally alter Vermont's program authorizing and enforcing DPOAs. Accordingly, the relevant provisions of Act 114 discriminate against the mentally ill in violation of the ADA and Section 504 of the Rehabilitation Act.[10]

10. We are sensitive to the fact that the ADA's preemption of these statutory provisions may have consequences not contemplated by the Vermont legislature and burdensome for health care professionals. We note, however, that nothing in this decision precludes statutory revisions that do not single out those who

## CONCLUSION

To summarize: We hold that (i) plaintiffs alleged a sufficient injury-in-fact to support standing to challenge Act 114; (ii) this case is ripe for adjudication; (iii) Act 114 violates the ADA by distinguishing between "qualified individuals" on the basis of mental illness; and (iv) the District Court's injunction prohibiting enforcement of certain provisions of Act 114 does not constitute a fundamental alteration to Vermont's DPOA program.

For the foregoing reasons, the judgment of the District Court is affirmed.

are disabled because of mental illness—for example, revisions that increase the competency threshold for executing a DPOA or that allow the override of *any* incompetent person's DPOA whenever compliance with it would substantially burden the interests of the state.