CONCURRING IN MOST OF THE JUDGMENT
SUTTON, Circuit Judge,
concurring in most of the judgment.
The federal government has determined that, because Clifford Tyler spent thirty days in a mental-health institution in 1986, that makes him mentally ill for life. With that horizon-less generalization in hand, the government claims authority to deny Tyler the fundamental right to possess a gun for the rest of his days, even though Tyler has presented evidence that, some *708 thirty years later, he does not present a risk to himself or others, and even though the government has not presented any individualized evidence about Tyler’s fitness to possess a gun but has instead relied on stereotypes about the mentally ill. That is where this case starts and ends — and that is all anyone needs to know to resolve it.
Tyler is entitled to present evidence about whether he would be a risk to himself or others if allowed to own a gun — as Congress once recognized when it funded a program for individuals to obtain precisely this relief from the federal government. 18 U.S.C. § 925(c). Congress’s decision in 1992 to cut the funds for that program and Michigan’s unwillingness to fill the void with a comparable program of its own do not turn off Tyler’s right to show that he, like most Americans, has the constitutional right to own a gun.
1. The Second Amendment establishes a fundamental right for American citizens to possess a gun. District of Columbia v. Heller, 554 U.S. 570, 595, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 3036, 3042, 177 L.Ed.2d 894 (2010).
2. Heller recognizes an excéption for some Americans — to respect “longstanding prohibitions on the possession of firearms by felons and the mentally ill.” 554 U.S. at 626-27, 128 S.Ct. 2783.
3. The statute at issue today, 18 U.S.C. § 922(g), purports to be the kind of prohibition that Heller was referring to. It applies to felons and the mentally ill. And it says, as pertinent here: “It shall be unlawful for any person ... (1) who has been convicted in.any court of, a crime punishable by imprisonment for a term exceeding one year; [or] ... (4) who has been adjudicated as a mental defective or who has been committed to a mental institution ... to ... possess in or affecting commerce[ ] any firearm.”
4. Think of the Heller exception as an off switch to the right to bear arms and of § 922(g) as Congress’s effort to define it. The statute describes two classes of individuals unable to possess a gun: felons (anyone convicted of a crime punishable by more than one year in prison) and the mentally ill (anyone “adjudicated as a mental defective or. who has been committed to a mental institution”). Heller did not define these exceptions; it had no reason to. But no one in our case denies these historically grounded and sensible explanations behind the exceptions: Legislatures have authority (1) to impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction and (2) to keep weapons out of the hands of those who, due to psychiatric challenges, pose a risk to themselves or others.
Nor does anyone deny that Heller must have been referring to “felons” and “the mentally ill” in the present tense. Heller does not stand for the proposition that anyone ever convicted of a felony falls outside the Second Amendment’s protections. Otherwise, Congress could ban gun possession by anyone with a felony to their name, even if the conviction was later expunged or the individual was pardoned. Cf. 18 U.S.C. § 921(a)(20). So too with mental illness. One’s status as a “felon” or as “mentally ill” may change over the course of a lifetime, and Heller creates an exception only for those who currently fall into these categories, not for anyone who ever did.
5. Congress first enacted a felon-in-possession, ban in 1938, but it did not give felons a way to regain their right to bear arms until thirty years later. Federal Firearms Act, Pub. L. No. 75-785, § 2(f), 52 Stat. 1250, 1251 (1938); An -Act to Strengthen the Federal Firearms Act, *709 Pub. L. No. 87-341, 75 Stat. 757, 757 (1961); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, sec. 902, §§ 921(b)(3), 922(f), 925(c), 82 Stat. .197, 228, 231, 233. The initial relief program, in 1968 allowed the Secretary of the Treasury to grant an exemption from the firearm ban for certain felons who could show (1). they were not likely to conduct.themselves “in an unlawful manner” and (2) “that the granting of the relief would not be contrary to the public interest.” Sec. 902, § 925(c), 82 Stat. at 233; see sec. 902, § 921(a)(17), 82 Stat. at 228. Congress re-enacted a slightly modified form of this relief program the same year as part of the Gun Control Act of 1968. Pub. L. No. 90-618, sec. 102, § 925(c), 82 Stat. 1213, 1225. That is also when Congress codified the felon-in-possession ban in its modern form and enacted the mental-illness provision before us today. Sec. 102, § 922(h)(1), (4), 82 Stat. at 1220-21. As of 1968, Congress thus prohibited firearm possession by felons, by anyone “who ha[d] been adjudicated as a mental defective,” and by anyone “who ha[d] been committed to any mental institution.” But only felons had a chance to gain relief from the ban.
That changed in 1986, when Congress expanded the relief program to ensure that anyone barred from possessing a firearm could seek an exemption, including those once deemed mentally ill. Firearms Owners’ Protection Act, Pub. L. No. 99-308, sec. 105, § 925(c), 100 Stat. 449, 459 (1986). The new provision also stated that, if the Secretary denied an exemption, the individual could seek review in federal district court. Id. This relief program continued to operate until 1992, when Congress defunded it. Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat.-1729, 1732 (1992). In 2008, Congress replaced the program with one that offered funding to States that set up their own relief regime. Thus far, thirty-one States have set up their own programs. Fed. Gov’t Supp. Br. 4. Michigan is not one of them. At no point has Congress required States to set up such programs. 'See Printz v. United States, 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).
6. At issue in today’s case is whether Congress may create status-based prohibitions on the right to bear arms without permitting individuals to show that the federal government has impermissibly characterized them. Surely it is common ground that the Second Amendment requires the federal government to allow an individual to possess a gun when it makes a classification mistake — when it engages the off switch in error. Say John R. Smith tries to purchase a gun but is told that he cannot do so based on a- governmental record that says John R. Smith has a felony conviction or once stayed in a mental-health institution. Smith claims not to be the Smith listed as a felon or listed as residing in an institution. The government ignores Smith’s entreaties, and the firearm sale never goes through. Because Heller tells us that the Second Amendment protects “the right of law-abiding, responsible citizens” (like Smith) to possess a gun, and because the government has denied Smith that right, it has violated Smith’s Second Amendment rights. 554 U.S. at 635, 128 S.Ct. 2783. Any other conclusion would give the government unanswerable authority to deny guns (or for that matter any constitutional right) to whomever it pleases, regardless of whether it has correctly classified the individual as subject to a permissible prohibition on his right to bear arms.
7. The - only difference between that hypothetical and this case is a related characterization problem. It’s not that the government has confused Clifford Tyler with another Clifford Tyler; it’s that the *710 government assumes that the mental health of Clifford Tyler in 1986 is the mental health of Clifford Tyler in 2016. If the individual has ever “been adjudicated as a mental defective” or “has been committed to a mental institution,” says the government, that is that: He necessarily is a risk to himself or others for the rest of his life and thus may not possess a gun for the rest of his life. That is a remarkable proposition. It would be one thing if the government were making this argument in 1927. See Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000. But it is not. No one today, I would have thought, thinks a prior institutionalization necessarily equals a present mental illness.
8. Keep in mind that Tyler is not demanding a gun today. He is demanding only what Congress used to permit and what most States still permit: an opportunity to show that he is not a risk to himself or others. And keep in mind that the only evidence in this case shows that he has a clean bill of mental health, he poses no danger to himself or others, and the health challenges that led him to enter a mental-health facility for thirty days thirty years ago are long gone. All that the government offers in response is an astonishingly broad generalization: that a prior institutionalization makes him unfit today.
9. That generalization cannot be squared with history and tradition. What determines the scope of the right to bear arms are the “historical justifications” that gave birth to it. Heller, 552 U.S. at 635, 128 S.Ct. 1410. Our common law heritage has long recognized that mental illness is not a permanent condition. See 1 William Blackstone, Commentaries *304-05; A. Highmore, A Treatise on the Law of Idiocy and Lunacy 104 (1807); see generally Batchelder, J., Concurring Op. 705-06. And that generalization makes even less sense today. See, e.g., Foucha v. Louisiana, 504 U.S. 71, 77-78, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). If there is one thing clear in American law today, it is that the government may not deny an individual a benefit, least of all a constitutional right, based on a sky-high generalization and a skin-deep assumption stemming from a long-ago diagnosis or a long-ago institutionalization. Once depressed does not mean always depressed; once mentally ill does not mean always mentally ill; and once institutionalized does not mean always institutionalized.
10. That is all there is to this case. Clifford Tyler has presented unrebutted evidence that he is not a risk to himself or others today. If he is right, he has a constitutional right to possess a gun. The government may not deny him that right based on a stigmatizing generalization arising from a mental health problem three decades old. It must give him an opportunity to show that he has the constitutional right to own a gun, all through a process focused on him — not generalizations about “mental defective[s]” or occupants of “mental institution[s],” as the statute infelicitously puts it — and one that will allow Tyler and the government a chance to introduce evidence about his capacity to possess a gun.
11. Tiers of review have nothing to do with it. That’s simply an expedition we need not take. Would we ask in a case of misidentification — John R. Smith’s case— whether intermediate or strict scrutiny applies to the government’s classification of him as a felon? I doubt it. Would we ask in the case of an individual, once a felon but no longer one due to a pardon, whether intermediate or strict scrutiny applies to the government’s continuing classification of him as a felon? I doubt it. In both of these cases, I would hope, we would say that, because the individual has plausibly alleged that the' government placed him in *711 the wrong category, he has a right to show as much in order to protect his right to possess a gun. So too for an individual once classified as mentally ill but who no longer is.
The First Amendment offers a useful analogy. Say the government claims it may regulate a particular type of speech because it is obscene and thus unprotected. See Miller v. California, 413 U.S. 15, 23, 36-37, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). A court would not look to tiers of scrutiny to figure out whether the government correctly classified the'speech; it would independently evaluate whether the speech is in fact obscene. Just so here. The government has assumed power to deny guns to those who were once institutionalized on the theory that they necessarily remain mentally ill and thus are unprotected. That is wrong — not because of anything this or that tier of review tells us but because institutionalization and mental illness are not ever-lasting synonyms. Just as the government may not ban protected speech by labeling it obscene, it may not deny a gun to a protected individual by labeling him mentally ill for lifei What is true for the First Amendment is true for the Second.
I do not mean to propose that we “jettison tiers of .scrutiny altogether” for either the First or Second Amendment. Lead Op. 692-93 n.14, Whatever utility they may have elsewhere, they have no role to play here. Just as we determine whether a speech restriction is content neutral before deciding “the level of scrutiny applicable” to the speech, we have no need to rule on what level of scrutiny is appropriate for the Heller exception when the Heller exception does not apply. Connection Distrib. Co. v. Holder, 557 F.3d 321, 329 (6th Cir. 2009) (en banc).
12. The parties, the majority, and the dissent make much of, and at times dispute, the statistical links. among mental illness, institutionalization, and gun violence. That is all well and good — if the individual still has a mental illness. But that is the only question that matters today. Anything else is a distraction. The focal point is that mental illness is not invariably a . permanent- condition, the premise by the way of a significant branch of the medical profession (psychiatry) that is devoted to ensuring that any such diagnosis does not become a life sentence. As the Ohio Disability Rights Law & Policy Center confirms in its amicus brief, one-half to two-thirds of patients with schizophrenia “significantly improved or recovered” over the course of long-term studies, “including some cohorts of very chronic cases.” Disability Rights Amicus Br. 7; see Courtenay M. Harding & James. H. Zah-niser, “Empirical Correction of Seven Myths About Schizophrenia with Implications for Treatment,” 90 Acta Psychiatrica Scandinavica 140, 140-41 (1994). The federal government (at least part of the federal government) agrees, as the Department of Health and Human Services correctly explains that “people.with mental health problems get better and many recover completely.” U.S. Dep’t of Health & Human Servs., Mental Health Myths and Facts, . https://goo.gl/Ga6dJ8 (last visited July 28, 2016).
Nor is Clifford Tyler the only American who has overcome a mental illness. Think of John F. Nash Jr., the Nobel Prizewinning mathematician who spent time in and out of mental institutions but who, “seemingly against all odds, ... appeared to overcome the illness that had afflicted him for so long” later in life. Emily Danger, “John F. Nash Jr. Dies; Nobel Laureate’s - Life Story Inspired ‘A Beautiful Mind,’ ” Washington Post, May 24, 2015, https://goo.gl/3gz5b6; Erica Goode, “John F. Nash Jr., Math Genius Defined by a *712 ‘Beautiful Mind,’ Dies at 86,” N.Y. Times, May 24, 2015, http://goo.gl/kAmTYk, Or of Georgia O’Keeffe, who entered a New York hospital in the midst of a nervous breakdown but whose recovery ushered in one of her most productive artistic periods. Dennis Abrams, Georgia O’Keeffe 90-91, 94-96 (2009). I could go on and on identifying other accomplished individuals, including U.S. Presidents, who have overcome serious mental illnesses. Jonathan R. T. Davidson et al,, “Mental Illness in U.S. Presidents Between 1776 and 1974: A Review of Biographical Sources,” 194 Journal of Nervous & Mental Disease 47, 49 (2006).
13. All we need to know to résolve this case is that Heller creates an on-off switch to the right to bear arms, that the government’s decision to engage or disengage that right for any individual is not beyond challenge, and that this is a present-tense inquiry: Is the individual properly characterized as a felon today or as mentally ill today in a way that makes him dangerous to himself or others? Tyler has plausibly alleged that the government’s characterization of him is inaccurate, and he is entitled to relief in the absence of contrary evidence about him. As the amicus brief for the Ohio Disability Rights Law & Policy Center confirms, a considerable body of research and caselaw shows that this outcome is undeniably the right one. Case after case laments (and corrects) the unfair generalizations that once applied to individuals with mental health challenges. The key insight is that no government may permanently deny rights based on generalizations stemming from classifications about any individual who once was institutionalized.
The government may not, for instance, deny driver’s licenses to formerly institutionalized individuals without a hearing; single out group homes housing the intel-
lectually disabled by requiring them to seek special-use zoning permits; ask applicants broad questions about then mental health history before granting them occupational licenses; or place special limitations on institutionalized individuals’ ability to make their own healthcare decisions. See, e.g., Gargagliano v. Se'c’y of State, 62 Mich.App. 1, 233 N.W.2d 159, 162-68 (1975) (driver’s licenses); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 447-50, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (special use permits); Clark v. Va. Bd. of Bar Examiners, 880 F.Supp. 430, 441-46 (E.D. Va. 1995) (occupational licenses); Hargrave v. Vermont, 340 F.3d 27, 31, 34-39 (2d Cir. 2003) (healthcare decisions). The principle also manifests itself in cases addressing when committed individuals must be released from confinement, all of which show that institutionalization does not amount to a permanent determination of mental illness or dangerousness. E.g., Foucha, 504 U.S. at 75-83, 112 S.Ct. 1780; Jones v. United States, 463 U.S. 354, 361-69, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). And it manifests itself in the Americans with Disabilities Act and the Rehabilitation Act, both of which forbid governments from “den[ying] ... benefits” to otherwise “qualified individual[s]” solely “by reason of [their] disability” or because they are “regarded as having” a disability. 29 U.S.C. §§ 705(9)(B), 794(a); 42 U.S.C. §§ 12102(1), 12132. Just as one’s physical condition changes over the course of a lifetime, worsening at some moments and improving at others, one’s mental condition changes, as well. A key lesson of disability rights law is that governments may not treat dynamic features as static and immutable.
14,' What appears to be driving the government’s position are two related fears: (1) that lots of other individuals will start, seeking hearings if we grant relief to Tyler, and (2) that some individuals previ *713 ously deemed mentally incompetent still should not possess a gun today. As to the first concern, no one would get a hearing without making -a threshold showing, premised on medical evidence, that they are fit to possess a gun. If there is a risk that the government will be swamped with applications, it is in the best position to prove it. The federal government after all operated a relief program from 1986 to 1992, and yet it offers' no evidence— none — that it was flooded by applications from those-who-had once been institutionalized or received a disqualifying diagnosis. Neither does -the government provide any evidence that the thirty-one States that offer such programs have faced problems in operating them. Fed. Gov’t Supp. Br. '4.
As to the second concern, the answer is similar. Tyler does not seek anything more than the relief program that once existed at the federal level and that now exists in many States outside Michigan. Where is the evidence that these programs did not then, or do not now, properly perform the needed screening function? Where is the evidence from the federal experience from 1986 to 1992 or from the States in recent years that they could not perform this assessment safely and without exposing the public to undue risks? And if the federal government is skeptical of its capacity to properly perform the screening procedure, why is it encouraging the States to do just that?
Nor is there any reason in fact to distrust the screening procedure. The individual will have to make a threshold showing that he can possess a gun safely today. The government may present contrary evidence if it wishes. And the administrative or judicial decision — essentially a factfind-ing — will receive deference in any later challenge to it.
15. I disagree with the lead opinion that we can leave the decision whether to give Tyler more process to the district court. That assumes different district courts could reach different decisions about whether to let Tyler present evidence about his mental health on this record. I don’t see how that could be so. Tyler has presented plenty of evidence that he is just fine and the government has presented nothing but generalizations to match it. So long as the government refuses to address Tyler’s individual circumstances, he is entitled to both a hearing and relief, and no district court judge could fairly conclude otherwise. Giving the government one more chance to “justify” its “lifetime ban” on gun possession by those who were involuntarily • committed is a doomed errand. Lead Op. 699. What evidence could possibly show that once-institutionalized individuals invariably have current mental illnesses?
16. I disagree with the dissent for a different reason. It not only thinks that the government could meet its burden; it thinks it. already has. The dissent cannot deny that the government has applied § 922(g)(4) to prohibit gun possession by mentally healthy individuals like Tyler. But it thinks that intermediate scrutiny permits the government to cast a sufficiently wide net to permit a prior diagnosis to be a proxy for a present health condition in view of the risk posed by other less healthy individuals. Dissent at 717-21. It is not uncommon in constitutional law to create rules that prophylactically over-protect constitutional rights. See Miranda v. Arizona, 384 U.S. 436, 467-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Mapp v. Ohio, 367 U.S. 643, 655-60, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Less common, indeed unprecedented, is the attempt to create a judicial rule, that prophylactically under-protects individual constitutional rights. I would not go down that road.
*714 [[Image here]]
When all' is said and done, this case turns on the recognition that mental illness is not a permanent classification, and yet the government has treated it as such in denying Tyler a gun. Through numerous thoughtful opinions in this case, no judge has challenged this point: Mental illness is not a fixed state of mind. Unable to shake the conclusion that follows from that agreed-upon premise, I would reverse the district court’s decision and hold that Tyler has stated a claim for relief under the Second Amendment and is entitled to the kind of process the government once provided to show that he is fit to possess a gun. Under these circumstances, the district court’s decision should be reversed, and the case should be remanded to the district court either to enter judgment for Tyler or to permit the district court to hold a hearing over whether Tyler is currently “mentally ill.”